*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. ALVAREZ, Minor.

UNPUBLISHED
April 18, 2024

No. 367683
Ingham Circuit Court
Family Division
LC No. 22-000685-NA

Before: GADOLA, C.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to the minor child, CA, under MCL 712A.19b(3)(c)(*i*), (g), and (j). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This appeal arises out of allegations of respondent-mother's medical neglect of CA, who was diagnosed with a rare genetic disorder that requires complex medical care and is characterized by structural abnormalities of the kidneys and urinary tract, maturity-onset diabetes of the young (MODY), developmental delay, and psychiatric concerns. In August 2022, petitioner filed a petition requesting removal of CA from respondent-mother's care after it received notice that respondent-mother discontinued CA's care with several specialists and failed to attend numerous primary care and pediatric subspecialty appointments. Petitioner also alleged that respondent-mother had a history of prior parental rights terminations and substance abuse, and that she had tested positive for cocaine in July 2022. A referee held a preliminary hearing and authorized the petition, ordering the removal of CA and placement with DHHS for care and supervision.

In September 2022, respondent-mother entered a plea admitting that her parental rights to three other children were terminated in February 2019 because of concerns with housing, substance abuse, and domestic violence. Respondent-mother also admitted that, in March 2019, there were new allegations of physical neglect, improper supervision, threatened harm, and physical abuse toward CA. As a result, CA was removed from respondent-mother's care and put into a foster home. In January 2021, CA was returned to respondent-mother's care with Intensive Neglect Services; however, those services ended in July 2021. Respondent-mother admitted further that, in July 2022, there were new allegations concerning her medical neglect of CA.

-1-

Respondent-mother admitted that CA has many health challenges that require regular appointments with several medical specialists, and that she faced a transportation barrier, yet she declined resources from CA's primary care physician to assist her with attending appointments. Respondent-mother also admitted that CA was currently off the growth chart for his age, and was at serious risk if his health concerns remained. Finally, respondent-mother admitted that she tested positive for cocaine in July 2022 and that she had an extensive history with substance abuse. The trial court found that these admissions were sufficient to provide a factual basis for one or more of the allegations in the petition, and it took jurisdiction over CA. The trial court ordered that reasonable efforts be made to reunify the family and maintained CA's placement with DHHS for care and supervision.

At the dispositional hearing, the foster-care worker testified that the main barriers to reunification were respondent-mother's substance abuse and ability to care for CA's special medical needs. The foster-care worker testified that respondent-mother would be provided with a substance abuse assessment, psychological evaluation, and parenting classes. The foster-care worker also stated that transportation assistance and bus tokens could be provided for parenting time, and that respondent-mother had been offered help to obtain her driver's license. Additionally, because many of CA's appointment were out of town, telehealth would be arranged for respondent-mother to attend CA's appointments virtually. The trial court ordered respondent-mother to, among other things, continue to participate in drug screens, obtain and complete substance abuse treatment, participate in a psychological evaluation, attend parenting classes and demonstrate an ability to use the concepts, attend all parenting time, cooperate with the foster-care worker to comply with court orders and ensure the proper care of CA, and to keep all appointments with the foster-care worker.

In December 2022, a dispositional review hearing was held. The foster-care worker testified that respondent-mother was successfully completing drug screenings, going to therapy, attending parenting classes, and attending parenting time. However, according to the foster-care worker, the current focus was assisting respondent-mother with her understanding of CA's present and future medical needs. The foster-care worker testified that she and respondent-mother frequently discussed CA's various medical appointments and specialists, and that respondent-mother seemed to struggle to remember or state the purpose for the appointments. The trial court noted that respondent-mother had completed her psychological evaluation, which estimated her global level of functioning to be within the mild-to-moderate intellectual disability classification. The psychologist described respondent-mother's prognosis as "poor" because her problems with substance abuse and lower intellectual function made it more likely that she would revert to her past patterns. The psychologist recommended that respondent-mother receive individual counseling with an emphasis on substance abuse and life training skills, "psychoeducation" related to CA's specific diagnosis, and individual parenting coaching. In particular, the psychologist recommended that information be presented in chunks and taught through the "teach back" method. The psychologist also recommended audio and visual educational materials, prompts, and role-playing exercises to help promote respondent-mother's understanding and retention of skills. The court maintained CA's placement with DHHS, and ordered compliance with the case service plan and psychology evaluation. In its order following the hearing, the court noted that respondent-mother was "mild to moderate low functioning" and ordered that respondent-mother receive "extra instructions, printed materials, clear directions—test her ability to 'teach back' what's being required of her."

In March 2023, another dispositional review hearing took place. A foster-care worker testified that there were no present concerns regarding respondent-mother aside from her inability to attend CA's appointments in person. The foster-care worker testified that respondent-mother could not take public transportation to CA's appointments because they were so far away, so the worker often transported her to appointments, which made it difficult to make all the appointments. The foster-care worker also acknowledged that respondent-mother had an intellectual disability and that she needed extra support to learn about CA's diagnosis to safely parent him. The trial court ordered DHHS to pay to assist respondent-mother with attending CA's medical appointments, stating that if respondent-mother did not attend his appointments, she would never fully understand CA's needs. The trial court maintained CA's placement with DHHS and ordered the foster-care worker to look closely at the psychological evaluation recommendations and follow them.

In June 2023, a referee held a permanency planning hearing. A foster-care worker testified that respondent-mother's only outstanding barrier was her "cognitive functions." According to the worker, respondent-mother still did not understand CA's diagnosis. The foster-care worker testified that

> from the conversations that we have on the lengthy trip to the parenting times I have frequent communication with [respondent-mother]. I have provided [respondent-mother] with documentation, physical documentation, with peer reviewed articles concerning recent medical appointments that [CA] had, definitions of medical professionals and what they do in their discipline, and we go over the reports in the vehicle on the way to . . . the parenting time.
>
> During that time [respondent-mother] is sufficient with reading the material and relaying the information back to me. But the following week, or the following parenting time, the information is no longer there and she can't recall much of the information, much of the vital information.

According to the foster-care worker, respondent-mother's parenting class was a general class, and was not specific to CA's medical needs. Regarding transportation, the foster-care worker testified that respondent-mother had still not obtained her driver's license; however, she apparently found several resources that could assist her with transportation to CA's medical appointments. Those supports, though, could not currently assist respondent-mother because of the distance of CA's placement.

The guardian ad litem (GAL) called respondent-mother to testify about her knowledge of CA's diagnosis. Respondent-mother testified that CA has a genetic disorder, but she could not fully describe his prognosis. Respondent-mother also testified that CA was on a special diet to make sure he does not have diabetes. CA's court-appointed special advocate (CASA) testified that she believed that respondent-mother and CA were bonded and that respondent-mother was appropriate during parenting time. The CASA also testified that she wanted to get more information about respondent-mother's capabilities. Respondent-mother's counsel requested that the referee not change the permanency plan, noting that respondent-mother was addressing the main barrier of her cognitive functioning with her therapist, talking through CA's medical conditions and treatments with the caseworker, asking questions at CA's medical appointments,

and progressing well through the case. The GAL requested that the referee change the permanency plan to adoption, noting that respondent-mother's barrier reduction was rated as "poor" two reporting periods in a row, that respondent-mother plainly did not understand CA's medical needs, and that she did not believe respondent-mother could meet CA's medical needs if he were returned to her care. Despite both the foster-care worker's and the CASA's recommendations of the continued goal of reunification, the referee changed the permanency planning goal to adoption and directed DHHS to initiate proceedings to terminate parental rights. According to the referee, "[CA] has been in foster care for most of his life. The mother does not appear to retain the medical information and barrier reduction is poor. The mother lacks the capacity to care for the medically fragile child."

In July 2023, petitioner filed an amended supplemental petition requesting termination of respondent-mother's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). Petitioner alleged that CA was originally removed from respondent-mother's care because of substance abuse issues and medical neglect, particularly surrounding her inability to ensure that CA attended all his required medical appointments. Petitioner alleged that respondent-mother continued to lack independent transportation or a valid driver's license and that, without the agency's supervision, transportation, or continued support, respondent-mother could not provide adequate care to her child. Additionally, petitioner alleged that respondent-mother continued to struggle to comprehend CA's medical conditions and needs. Further, petitioner alleged that on the basis of respondent-mother's psychological evaluation, she may not have the capacity to ensure CA's attendance at medical appointments or follow necessary recommendations established by medical professionals. Given the length of time CA had been in care, it was unlikely that respondent-mother could rectify the current barriers.

At the termination hearing, the foster-care worker testified that, at the time the petition for termination was filed, respondent-mother's transportation, emotional stability, and parenting continued to be barriers to reunification, and respondent-mother admitted that transportation remained her biggest barrier to parenting CA. Respondent-mother testified that she still did not have a driver's license but that her goal was to obtain it by the following month. She also testified that she did not have a car, and that she would need to work and save money to buy one. However, respondent-mother testified that she recently found resources to help her attend appointments without a license, like Lyft and the Davies Project, and that those resources could start as soon as CA were returned to her care. The foster-care worker testified that he communicated with respondent-mother about getting her driver's license several times, and that respondent-mother told him she was working with her therapist on it; however, the caseworker offered her resources to assist her with obtaining her license, including driving her to the Secretary of State. The foster-care worker testified that DHHS was providing respondent-mother with bus passes, Lyft cards, and transportation to anything involving CA.

CA's foster mother testified that CA had been placed with her from February 2019 to January 2021 and again from August 2022 to the present. The foster mother testified that CA had a genetic disorder, short stature, hydronephrosis (fluid around his right kidney), macrocephaly, hypotonia, and asthma; additionally, CA had MODY, which meant that CA could develop diabetes at a young age. Additionally, a neuropsychological assessment revealed emerging signs of cognitive delays. Meanwhile, respondent-mother testified that she did not know that CA was at risk of developing diabetes. When asked about CA's diagnoses, respondent-mother testified that

CA had a genetic disorder, "a renal cyst on the right side of his kidney," and short stature, but stated that CA had no other diagnoses. The foster mother testified that CA was on a special diet limiting fat intake because he was at high risk for diabetes. According to the foster mother, respondent-mother did not ask questions at CA's medical appointments and on the rare occasions that she did ask questions, she asked the wrong specialists about issues not within their domain. The foster mother also testified that whenever doctors asked questions about CA beyond his name, date of birth, and diagnosis, she had to step in an answer them for respondent-mother.

Respondent-mother testified that CA "could probably die" without regular medical care and she agreed that it was important for her to understand the purposes for CA's medical appointments because he was a fragile child. Respondent-mother testified that she had been researching to understand CA's diagnoses, by looking at resources from the foster-care workers and the doctors. Respondent-mother also testified that, in individual therapy, she was working on "cognitive comprehension," how to make sure CA attended his medical appointments, and preventing relapse. However, respondent-mother testified that she did not believe her cognitive functioning or emotional stability were barriers to parenting CA. The following exchange occurred between respondent-mother and the petitioner:

> Q. Did you know what it meant when Doctor Haugen stated you have lower levels of intellectual functioning?
>
> A. No, I do not.
>
> Q. Do you believe that you need extra help to get through services, or to apply parenting techniques?
>
> A. Maybe the parenting type thing, but the other, no.
>
> Q. Okay. Do you think that the parenting support or non-support could impact your ability to parent [CA]?
>
> A. No.

Respondent-mother testified that she remained organized by writing on a calendar and using her phone but acknowledged that she did not like to ask for help. The foster-care worker, respondent-mother, and CA's foster mother all testified that respondent-mother and CA were bonded.

Ultimately, the foster-care worker recommended that the court terminate respondent-mother's parental rights because between the first and second time that CA was removed from respondent-mother, CA had been in foster care for 2 years and 8 months. The foster-care worker opined that returning CA to respondent-mother's care would cause a substantial risk of harm to the child, and that respondent-mother had not made substantial progress alleviating the conditions for initial removal. Respondent-mother testified that she believed she had benefited from therapy, transportation services, and parenting classes and that if given more time to work on services, she would be ready to care for CA in five weeks. According to respondent-mother, she believed she had the permanency and stability to provide for CA immediately.

The trial court found by clear and convincing evidence that the allegations in the petition were true, and that they satisfied the statutory grounds for termination pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). Regarding the statutory grounds for termination pursuant to former MCL 712A.19b(3)(c)(*i*), the trial court found that 182 days had elapsed since the initial disposition order, that the conditions that led to adjudication continued to exist, and that there was no reasonable likelihood that the conditions would be rectified in a reasonable amount of time. The trial court also determined that termination of respondent-mother's parental rights was in CA's best interests because of his special needs, the length of time he spent in foster care, his need for permanency and stability, respondent-mother's ability to care for him, and her prior termination of parental rights. The trial court found that DHHS made reasonable efforts to reunify the family including, drug testing, parenting time, resources on different ways to secure transportation, parenting classes, individual counseling, support in obtaining a driver's license, education as to the child's condition, oversight, and a psychological evaluation. The trial court ordered termination of respondent-mother's parental rights. This appeal followed.

## II. REASONABLE EFFORTS

On appeal, respondent-mother challenges the reasonableness of the efforts made to reunify the family. In particular, respondent-mother argues that petitioner's efforts were not reasonable because it failed to accommodate her intellectual disability as required by the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*.

"In order to preserve an argument that petitioner failed to provide adequate services the respondent must object or indicate that the services provided to them were somehow inadequate." *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022) (quotation marks and citation omitted). A respondent must object to the provision of services when the trial court adopts a service plan. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). "However, even if a parent does not object or otherwise indicate that the services provided were inadequate when the initial case services plan is adopted, such an objection or challenge may also be timely if raised later during the proceedings." *Atchley*, 341 Mich App at 337. Likewise, a claim that DHHS failed to make accommodations consistent with the ADA must be raised in a timely fashion. *In re Terry*, 240 Mich App 14, 26 n 5; 610 NW2d 563 (2000). Neither respondent-mother nor her counsel objected or otherwise indicated that the initial case service plan was inadequate; nor did they challenge petitioner's provision of accommodations. Accordingly, this issue is unpreserved.

In general, this Court reviews for clear error a finding regarding reasonable efforts. See *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A finding is clearly erroneous if, even if there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made. *Atchley*, 341 Mich App at 337. However, unpreserved issues are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). A plain error affecting substantial rights is an error that is "clear or obvious" and that affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999)

Except under certain aggravating circumstances, petitioner has a statutory duty to make reasonable efforts to reunify the child and family before a court may terminate a parent's rights. *Atchley*, 341 Mich App at 338. Petitioner's "duty to make reasonable efforts toward reunification is distinct from its duty to prove at least one statutory ground for termination by clear and

convincing evidence." *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 3. Although the two obligations are legally distinct, they do not stand alone conceptually. The "contention that reasonable services were not offered ultimately relates to the issue of sufficiency" of the evidence in support of termination. *Fried*, 266 Mich App at 541. The reasonableness of efforts depends on the context and particular circumstances of each case and in light of petitioner's knowledge. See *In re Hicks/Brown*, 500 Mich 79, 85-90; 893 NW2d 637 (2017). "As part of these reasonable efforts, [petitioner] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. "Not only must respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). However, efforts at reunification cannot be reasonable unless the petitioner "modifies its services as reasonably necessary to accommodate a parent's disability." *Hicks/Brown*, 500 Mich at 90. "Absent reasonable modifications to the services or programs offered to a disabled parent, the petitioner has failed in its duty under the ADA to reasonably accommodate a disability." *Id*. at 86. When challenging the services offered, the respondent "must establish that she would have fared better if other services had been offered." *In re Sanborn*, 337 Mich App 252, 266; 976 NW2d 44 (2021).

The nature of the alleged grounds for termination and the evidence supporting those grounds for termination may be relevant to the reasonableness of the efforts made, and it is therefore appropriate to discuss briefly the statutory grounds for termination on which the trial court relied. See *In re Rippy*, 330 Mich App 350, 355-358; 948 NW2d 131 (2019). The trial court terminated respondent-mother's rights on the basis of MCL 712A.19b(3), which, at the time of the termination proceedings, provided in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.[1]

At the time of adjudication, respondent-mother's barriers to reunification were transportation, her inability to understand CA's medical needs, and her substance abuse issues. Although the trial court found that respondent-mother had addressed her substance abuse problems and had completed parenting classes, the court held that respondent-mother had yet to wholly rectify her transportation barriers or her inability to advocate for CA's medical care and understand his needs. Considering the amount of time CA had been in placement, the trial court held that the conditions that led to adjudication were still present and that those conditions could not be rectified in a reasonable time considering CA's age. The trial court held that respondent-mother's inability to fully understand CA's medical needs and her lack of transportation also demonstrated that she could not provide proper care and custody to CA, and that there was a reasonable likelihood of harm to CA if he was returned to her custody. The trial court's decision to terminate respondent-mother's parental rights was, therefore, based on its assessment of respondent-mother's progress in understanding CA's medical condition and her overall ability to manage his care and special needs.

The trial court did not plainly err when it found that petitioner made reasonable efforts toward reunification and provided respondent-mother with sufficient accommodations to assist her understanding of CA's medical condition in light of her intellectual disability. See *Hicks/Brown*, 500 Mich at 90. The record demonstrates that petitioner assisted respondent-mother with her comprehension of CA's medical conditions, provided her multiple resources, and actively worked to ensure respondent-mother's presence at medical appointments. The foster-care worker testified that he provided respondent-mother with educational materials about CA's medical conditions, that he tested her on the information, and that he also discussed CA's conditions with her on numerous occasions in which they would rehearse CA's condition. Respondent-mother testified that she was actively working with her therapist on her "cognitive comprehension" of CA's medical needs, getting her driver's license, and strategies to help her ensure that she could bring CA to his medical appointments. Respondent-mother also attended CA's medical appointments through petitioner's provision of Lyft vouchers and direct rides.

Respondent-mother argues that the trial court specifically ordered that respondent-mother be provided with extra instructions, printed materials, or clear directions and that there is no evidence in the record that these instructions were followed. However, as stated above, the foster care worker directly provided assistance to respondent-mother to help her understand CA's medical needs with printed educational materials and numerous conversations about his care. Respondent-mother also argues that petitioner failed to offer her assistance with securing her driver's license. Yet the foster-care worker also testified that he communicated with respondent-mother several times about getting her driver's license, that he offered to assist her by taking her

---

[1] MCL 712A.19b(3)(j) was stylistically amended, effective February 13, 2024, to replace "he or she" with "the child." See 2023 PA 295.

to the Secretary of State, and that respondent-mother told him she was working with her therapist on this.

Based on this record, we conclude that the trial court did not plainly err when it found that petitioner reasonably modified respondent-mother's services to accommodate her disability and that these efforts were reasonable. See *Carines*, 460 Mich at 763. Despite petitioner's numerous services and accommodations, respondent-mother unfortunately could not demonstrate an understanding of CA's medical condition and needs such that she would be able to safely care for him. See *TK*, 306 Mich App at 711. Moreover, respondent-mother has failed to establish that she would have fared better if other services had been offered. See *Sanborn*, 337 Mich App at 266.

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Sima G. Patel